UNITED STATES DISTRICT COURT OF NEW HAMPSHIRE

| | |
|---|---|
| M.L., a minor, by and through her father and next friend, D.L., | ) ) ) |
|   Plaintiff | ) ) |
| v. | ) ) |
| CONCORD SCHOOL DISTRICT, SCHOOL ADMINISTRATIVE UNIT 8, TERRI FORSTEN, Superintendent of Concord School District, in her individual and official capacity, THOMAS SICA, Principal of Concord High School, in his individual and official capacity, THOMAS CRUMRINE, Assistant Principal of Concord High School, in his individual and official capacity, CHALI DAVIS, Assistant Principal of Concord High School, in her individual and official capacity, and JAMES CORKUM, Assistant Principal of Concord High School, in his individual and official capacity | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
|   Defendants | ) ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## I.    INTRODUCTION

Title IX protects all persons in the United States from discrimination based on sex in education programs and activities that receive federal financial assistance.  Title IX applies to all institutions that receive federal financial assistance, including state and local educational agencies.  Under Title IX, all such educational agencies must disseminate a notice of nondiscrimination.  This notice must be widely distributed, available, and easily accessible to the school community each year.  The notice must also include definitions of sexual harassment and sexual violence, instructions on how and where students, parents and

employees can make complaints of sex discrimination, sexual harassment or sexual violence and the identity of the Title IX Coordinator.  The Title IX Coordinator then is required to provide oversight in order to ensure that individual complaints are appropriately investigated.

When school districts and their administrators are notified of incidents of student-on-student sexual harassment or sexual violence in their schools, they have an obligation to investigate all complaints, take reasonable steps to stop the harassment, prevent reoccurrence and address the harm incurred.  Moreover, when school districts learn that the steps they have taken were inadequate in preventing further sexual harassment, they are required to take further reasonable action in light of the known circumstances.   If they fail to take these steps, then they will be deemed to have acted with "deliberate indifference" to the known acts of sexual harassment and will be liable for the resulting injuries.

In this case, the Plaintiff M.L. was sexually assaulted on the school bus by another student.  Although the incident was immediately reported to school district administrators, the incident was not fully investigated for approximately three months.  During this time, the student perpetrator went largely unpunished and continued to enjoy the educational benefits offered by the school.  Meanwhile, as a result of these factors, M.L. was depressed, felt unsafe and uncomfortable at school and was instructed by school district staff on how to use different stairwells and hallways to avoid the perpetrator.  Ultimately, the investigation found that, although the sexual assault was unwelcomed contact, the student perpetrator did not violate the sexual harassment policy because M.L. froze during the assault instead of saying no or asking him to stop.  This incorrectly, and in direct contradiction to federal law, shifted the burden of responsibility of a sexual assault from the perpetrator to the victim.  Moreover, as explained by the Office for Civil Rights in a guidance published seventeen (17) years ago,

acquiescence or failure to complain about the conduct does mean the conduct was welcome. Furthermore, this standard ignores the research that has been conducted regarding temporary immobility during sexual assault, which recently has been described by many of Harvey Weinstein's victims.

## II.      PARTIES

1. The Plaintiff, M.L. is a seventeen (17) year old minor and is a resident of the Town of Deerfield, New Hampshire.  At all relevant times, M.L. was a resident of Deerfield and a student at Concord High School, pursuant to Deerfield School District's Tuition Agreement with the Concord School District.  As a result, the Concord School District and School Administrative Unit 8 were responsible for providing M.L. with an education under federal and state law.  M.L. appears by her father and next friend D.L. (hereinafter "the Father").

2. The Defendant, Concord School District (hereinafter "Concord") is a public school district organized under the laws of the State of New Hampshire and is a governmental subdivision of the State of New Hampshire, located in Concord, New Hampshire. Concord is responsible for providing public education to all elementary school, middle school, and high school students within its boundaries.  On June 8, 2004, Concord and the Deerfield School District (hereinafter "Deerfield") entered into an agreement under which Deerfield would send all of its students, grades 9 through 12, to Concord High School for schooling.  Under the terms of this agreement, Concord must accept all of these students and be responsible for their education.  Under the agreement, Concord must provide these students with access to the same opportunities for educational and cultural advancement and improvement as the students residing in the City of Concord.

Additionally, these students are subject to the same rules, regulations and due process procedures pertaining to all students within Concord.  Therefore, at all relevant times, all students, grades 9 through 12, from Deerfield who attended Concord High School and were entitled to the same educational opportunities and protections as those students residing in Concord.  As a public school district, Concord owes a duty of reasonable supervision to each of its students, including M.L.  It is also a recipient of federal funds and is responsible for complying with all aspects of Title IX.  Concord is being sued both directly and based on a claim of respondeat superior or vicarious liability for the unlawful conduct of Terri Forsten, Superintendent of Concord, Thomas Sica, Principal of Concord High School, Thomas Crumrine, Assistant Principal of Concord High School, Chali Davis, Assistant Principal of Concord High School, and James Corkum, Assistant Principal of Concord High School.

3. The Defendant, School Administrative Unit 8 (hereinafter "SAU 8") is a school administrative unit organized under the laws of the State of New Hampshire and is a governmental subdivision of the State of New Hampshire.  It is comprised of one school district, Concord.  However, on June 8, 2004, Concord and Deerfield entered into an agreement under which Deerfield would send all of its students, grades 9 through 12, to Concord High School for schooling.  Under the terms of this agreement, Concord must accept all of these students and be responsible for their education.  Under the agreement, Concord must provide these students with access to the same opportunities for educational and cultural advancement and improvement as the students residing in the City of Concord.  Additionally, these students are subject to the same rules, regulations and due process procedures pertaining to all students within Concord.  Therefore, at all

relevant times, all students, grades 9 through 12, from Deerfield who attended Concord

High School and were entitled to the same educational opportunities and protections as

those students residing in Concord.  Thus, SAU 8 is responsible for all students within

Concord's boundaries and those students who are provided with the same educational

opportunities by Concord, such as those from Deerfield.  SAU 8 is located in Concord,

New Hampshire.  SAU 8 is responsible for providing public education to all children

residing in its boundaries.  As a school administrative unit, SAU 8 owes a duty of

reasonable supervision to each of the students within its district, including M.L.  SAU 8

is also a recipient of federal funds and is responsible for complying with all aspects of

Title IX.  SAU 8 is being sued both directly and based on a claim of respondeat superior

or vicarious liability for the unlawful conduct of Terri Forsten, Superintendent of

Concord, Thomas Sica, Principal of Concord High School, Thomas Crumrine, Assistant

Principal of Concord High School, Chali Davis, Assistant Principal of Concord High

School, and James Corkum, Assistant Principal of Concord High School.

4.  The Defendant, Terri Forsten (hereinafter "Superintendent Forsten") is the

Superintendent of Concord and, at all relevant times, was employed by SAU 8 and

Concord.  As an administrator in SAU 8 and Concord, Superintendent Forsten had a duty

to execute all School Board policies and to oversee the observance of all School Board

policies by all persons employed by Concord.  As a result, Superintendent Forsten had an

obligation to ensure that all students attending Concord and SAU 8 schools, including

M.L. at Concord High School, were being educated in an environment that was free from

harassment in compliance with Title IX.  Superintendent Forsten also owes a duty of

reasonable supervision to all students, including M.L. Superintendent Forsten is being sued in her individual and official capacity.

5. The Defendant, Thomas Sica (hereinafter "Principal Sica") is the Principal of Concord High School and, at all relevant times, was employed by SAU 8 and Concord. As an administrator at Concord High School, Principal Sica has a duty to oversee, supervise and facilitate the daily operations of the school. Principal Sica also owes a duty of reasonable supervision to all students, including M.L. Additionally, at all relevant times, Principal Sica had an obligation to take reasonable steps to ensure that all students attending Concord High School, including M.L., were being educated in an environment that was free from harassment in compliance with Title IX. Principal Sica is being sued in his individual and official capacity.

6. The Defendant, Thomas Crumrine (hereinafter "Assistant Principal Crumrine") is an Assistant Principal of Concord High School and, at all relevant times, was employed by SAU 8 and Concord. As an administrator at Concord High School, Assistant Principal Crumrine has a duty to oversee, supervise and facilitate the daily operations of the school. Assistant Principal Crumrine also owes a duty of reasonable supervision to all students, including M.L. Additionally, at all relevant times, Assistant Principal Crumrine had an obligation to take reasonable steps to ensure that all students attending Concord High School, including M.L., were being educated in an environment that was free from harassment in compliance with Title IX. Assistant Principal Crumrine is being sued in his individual and official capacity.

7. The Defendant, Chali Davis (hereinafter "Assistant Principal Davis") is an Assistant Principal of Concord High School and, at all relevant times, was employed by SAU 8 and

Concord.  As an administrator at Concord High School, Assistant Principal Davis has a duty to oversee, supervise and facilitate the daily operations of the school.  Assistant Principal Davis also owes a duty of reasonable supervision to all students, including M.L. Additionally, at all relevant times, Assistant Principal Davis had an obligation to take reasonable steps to ensure that all students attending Concord High School, including M.L., were being educated in an environment that was free from harassment in compliance with Title IX.  Assistant Principal Davis is being sued in her individual and official capacity.

8.  The Defendant, James Corkum (hereinafter "Assistant Principal Corkum") is an Assistant Principal of Concord High School and, at all relevant times, was employed by SAU 8 and Concord.  As an administrator at Concord High School, Assistant Principal Corkum has a duty to oversee, supervise and facilitate the daily operations of the school.  Assistant Principal Corkum also owes a duty of reasonable supervision to all students, including M.L.  Additionally, at all relevant times, Assistant Principal Corkum had an obligation to take reasonable steps to ensure that all students attending Concord High School, including M.L., were being educated in an environment that was free from harassment in compliance with Title IX.  Assistant Principal Corkum is being sued in his individual and official capacity.

### III.    JURISDICTION AND VENUE

9.  This action is being brought under Title IX, 20 U.S.C. § 1681, et seq. (hereinafter "Title IX"), 42 U.S.C., § 1983 and state common law.  Further, the Plaintiff is requesting reasonable attorney's fees pursuant to 28 U.S.C. §1988.  Therefore, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1343(a)(3), 1331 and 1367.

10. Venue is proper pursuant to 28 U.S.C. § 1391 because the acts and omissions which give rise to this action occurred in this district and all Defendants reside in this district.

## IV.    FACTUAL BACKGROUND

11. M.L. is a seventeen (17) year old student who attended Concord High School as a junior during the 2017 – 2018 school year.

12. According to the tuition agreement between Concord and Deerfield, all Deerfield students, grades 9 through 12, attended Concord High School during the 2017 – 2018 school year.  Under the agreement, Concord provided these students with access to the same opportunities for educational and cultural advancement and improvement as the students residing in the City of Concord.  These students were subject to the same rules, regulations and due process procedures pertaining to all students within Concord.

13. During the 2017 – 2018 school year, Concord had a Sexual Harassment Policy (hereinafter "Title IX Policy") and corresponding procedures for responding to complaints of sexual harassment.

14. The Title IX Policy defined sexual harassment broadly and included sexual advances or pressure for sexual activity, offensive sexual behavior, and brushing, touching, patting, or pinching someone as prohibited behaviors under the Title IX Policy.

15. Concord's corresponding procedures for responding to complaints of sexual harassment required that all school employees who know or observe harassment of students to report the harassment to the assigned sexual harassment investigator, in accordance to the complaint procedure in the Title IX Policy.

16. Once sexual harassment is reported, the procedures of the Title IX Policy require that administration take the following actions:

    a.   Conduct an interview with the victim;

    b.   Conduct an interview with the alleged offender;

    c.   Provide a written report of the investigation to the Superintendent of Schools within twenty (20) days of receiving the complaint;

    d.   Determine, within ten (10) days of receiving the written report, what, if any, corrective action is appropriate;

    e.   Inform the victim of the results of the investigation and/or any corrective action, if appropriate; and

    f.   Inform the alleged offender of the results of the investigation and/or any corrective action, if appropriate.

17. During the 2017 – 2018 school year, Concord had a Student Safety and Violence Prevention – Bullying Policy (hereinafter "Bullying Policy") and corresponding procedures for responding to complaints of bullying.

18. The Bullying Policy defined bullying broadly and included incidents that caused emotional distress to a student or created a hostile educational environment as examples of behaviors prohibited under the Bullying Policy.

19. Concord's corresponding procedures for responding to complaints of bullying required that all school employees who witnessed, received a report of, or had reliable information that a student was being subjected to bullying to report the bullying to the Principal or his designee.

20. Once bullying is reported, the procedures of the Bullying Policy require the administration to take the following actions:

    a.   Notify the parent of the victim within 48 hours;

b.   Notify the parent of the alleged offender within 48 hours;

c.   Investigate the report within five (5) days;

d.   Determine whether the reported action or incident constitutes a violation of the Policy based on all facts and surrounding circumstances;

e.   Recommend remedial action, if appropriate;

f.   Complete a written final report;

g.   Forward all substantiated reports of bullying to the Superintendent;

h.   Provide a report of the findings of the investigation to the parents of the victim within ten (10) days of completion; and

i.   Provide a report of the findings of the investigation to the parents of the alleged offender within ten (10) days of completion.

21. The Bullying Policy also included a provision to protect students from retaliation for making a good faith report of alleged bullying and corresponding procedures once a report of retaliation was made.

22. Once retaliation is reported, these procedures require the Principal to consider the nature, severity and circumstances of the act of reported retaliation and to assign appropriate remedial action, if necessary.

23. On or around November 29, 2017, Student A sat next to M.L. on the school bus and put his hand on her thigh.  Student A remained in the seat with M.L. and kept his hand on her thigh for the majority of the bus ride.  M.L. immediately felt uncomfortable, tried to move away from Student A and tried to position her backpack in between the two of them.

24. Eventually, after other students got off the bus and other seats became available, M.L. was able to move to another seat and put physical distance between herself and Student A.  However, shortly thereafter, Student A moved and again sat next to M.L. in her new seat.  Student A immediately started kissing M.L. on the mouth and began groping her chest over her clothes.  M.L. froze and did not know what to say or do.  Student A continued to kiss her, touched her thighs and waist, unbuckled her belt, placed his hand in her underwear and put his fingers inside of her vagina, moving them back and forth. Student A eventually removed his fingers, put his hand in his pants and began touching his own genitals.  During this incident, the bus driver repeatedly called out to Student A and told him to move back to his seat.  As the bus approached M.L.'s stop, she asked Student A to move and he refused to do so until the bus came to her stop.  Later, at Student A's bus stop, he told the bus driver that she needed to get her facts straight.  He claimed that they were watching a movie and if she said anything, he was going to call the bus company and tell them his ride is over an hour long, which is illegal.

25. Following Student A's comments, the bus driver became concerned for M.L. and contacted her Father to report what she had seen transpire between M.L. and Student A on the bus.

26. Upon information and belief, later on that day the bus driver also contacted school administration and the transportation company to report what she had seen transpire between M.L. and Student A on the bus.

27. On or around November 30, 2017, M.L. sent Student A a text message, stating that she was not comfortable with what happened on the bus and did not want to be his friend

anymore.  Student A responded that he knew he had gone too far and he did not know what he was thinking.

28. On or around November 30, 2017, M.L.'s Mother and Father (hereinafter "the Parents") called the school and informed administration that an incident had happened on the bus involving M.L. and Student A.

29. On or around November 30, 2017, M.L. was interviewed by Assistant Principal Corkum and the Student Resource Officer in regards to the incident that occurred on the bus.  At this time, M.L. did not feel comfortable reporting the full details of the incident to two adult males, and only disclosed the unwanted and nonconsensual kissing and touching above her clothing.

30. During this interview M.L. provided Assistant Principal Corkum with a written statement, discussing the details of the incident that she felt comfortable enough to disclose at that time, including the unwanted and nonconsensual kissing and touching above her clothing.

31. Upon information and belief, Student A was also interviewed that day by school administration in regards to the incident that happened on the bus.

32. On or around November 30, 2017, M.L. received a text message from Student A, requesting M.L.'s father's phone number.  M.L. later reported this text message to Assistant Principal Crumrine.  Later on that night, M.L. blocked Student A's phone number so he could not contact her further.

33. On or around December 4, 2017, M.L. boarded the school bus and could not see where Student A was sitting.  After she sat down, Student A popped up from his seat, which was close to hers, so M.L. moved her seat to put more distance between them.

34. On or around December 5, 2017, M.L. boarded the school bus and was informed by the bus driver that Student A was sitting directly behind M.L.'s usual seat.  M.L then chose a different seat in order to stay away from Student A.

35. On or around December 5, 2017, M.L. believed that Student A was following her around the school.  Specifically, M.L. observed Student A standing in front of the elevator hallway.  M.L. believed that this was out of the ordinary for Student A, as he had not been in that part of the school since Quarter One of the school year.  This area was also frequented by M.L., as she often sat there prior to the start of school every day.

36. On or around December 5, 2017, M.L. reported that day's incidents to Assistant Principal Crumrine.  M.L. also reported the text message she had received from Student A on November 30, 2017 at this time.

37. On or around December 6, 2017, M.L. met with Assistant Principal Davis, a female administrator, to discuss the November 29th incident on the bus.  M.L. told her about the kissing and unwanted touching that she previously disclosed.  Additionally, M.L. told her that Student A touched her under her clothing, undid her belt, and put his hand under her jeans and underwear.  M.L. told Assistant Principal Davis that Student A then penetrated her with his fingers and eventually removed his hand and put it on his own genitals.  M.L. told Assistant Principal Davis that she did not speak or open her eyes during this part of the incident, but that she froze and did not know what to do.  She also told her that it was not consensual.  M.L. also told Assistant Principal Davis about the text message she had sent to Student A and the messages Student A had sent in response.  M.L. also repeated the incidents that had occurred in the days following the initial incident on both the bus and in the school building.  M.L. had also previously shared these details in a written

statement.  M.L. also told Assistant Principal Davis that she felt uncomfortable around Student A and that she had already blocked Student A's phone number and blocked him on all forms of social media.

38. During this meeting, M.L. made a list of things that would make her feel safe in school. These included not being on the same bus as Student A, not having to see Student A in school, not having to avoid places in the school building where she was usually comfortable, and being able to eat lunch without having to worry about seeing Student A in the cafeteria.

39. On or around December 7, 2017, the Parents spoke with Assistant Principal Crumrine on the phone.  At that time, Assistant Principal Crumrine informed the Parents that he had finished his investigation and determined that there was not enough evidence to determine that Student A violated the sexual harassment policy.  He stated that the Deerfield Police had been contacted and that Concord High School was working to transfer Student A to another bus.  Assistant Principal Crumrine would not tell the Parents who contacted Deerfield Police, when they were contacted or what was discussed.

40. On or around December 14, 2017, M.L. and her Father met with Principal Sica.  Despite Assistant Principal Crumrine stating that no violation had occurred, Principal Sica told them that the investigation was completed, that Student A had violated the sexual harassment policy, that he would be suspended from the bus for ten (10) days and thereafter there would be assigned seating.

41. On or around December 21, 2017, M.L.'s Parents received a letter from Assistant Principal Crumrine with the findings of the school's initial investigation into M.L.'s

November 30th report.  Assistant Principal Crumrine concluded that Student A did commit unwanted physical contact with M.L. during the school bus ride.  Specifically, Student A chose to move his seat on the bus to sit next to M.L. and had kissed her and put his hand on her thigh and waist.  Assistant Principal Crumrine indicated that Student A had been suspended from the bus for ten (10) school days and there would be assigned a seat on the bus upon his return and that Student A was instructed not to have any contact with M.L.

42. The letter also stated that Student A had been given an official letter stating that he may not have any contact, through any means, with M.L.

43. The letter also referenced M.L.'s further statement and report of sexual assault that she made to Assistant Principal Davis on December 6, 2017.  Specifically, the letter stated that this matter had been referred to the Deerfield Police Department.

44. It was not until January 24, 2018 that Concord decided to reopen the investigation relating to the report of penetration.

45. Upon information and belief, Concord did not investigate the report of penetration until it decided to reopen its investigation on January 24, 2018.  This was after the Parents expressed their frustration with Concord's indifferent and inappropriate response to M.L.'s report of sexual assault.

46. Beginning in early December, Student A began reaching out to other students at Concord High School who were friends with M.L. to talk with them about the situation and the school's investigation.  He also began making threatening statements to these students.

47. On or around December 5, 2017, Student A sent a series of text messages to Student B.  The text messages from Student A to Student B were very alarming to Student B, and

prompted Student B to reach out to both M.L. and M.L.'s brother to check on her well-being. The text messages from Student A, later obtained by the Parents, included the following statements:

    a. "It's burying time."

    b. "People are gonna learn what it's like to have your life fucked up."

    c. "If [M.L.] is talking about it then she's fucked."

    d. "You'll see the payback that's gonna take place."

    e. "[M.L.]'s completely fabricating a ton of bullshit for no reason… I literally don't know what the fuck is wrong with people but it seems like all anyone wants to do is play a game of let's fuck over [Student A]… for no goddamn reason … so you know what? It's burying time."

48. During this time, another friend, Student C approached M.L. in the hallway and gave her a hug. Student C indicated that he had heard that something happened between M.L. and Student A and that Student C was sorry about it.

49. Over winter vacation, Student C messaged M.L. regarding her recent avoidance of and isolation from her friends. Student C told M.L. that Student D, the former girlfriend of Student A, had told Student C that Student A "had gone too far" with M.L.

50. On or around January 14, 2018, Student E, a friend of M.L., asked if M.L. was still suing Student A. Student E informed M.L. that Student D was telling other students that M.L. was suing Student A and that M.L. had accused Student A of rape, but that there was not enough evidence or any witnesses to prove it. Student E then tried to explain the difference between sexual harassment, sexual assault and rape to M.L. Student E told

M.L. that she didn't believe M.L. had been raped because Student E did not know how rape could happen on a school bus.

51. On or around January 11, 2018, the Parents went to Superintendent Forsten's office and attempted to speak with her. They were told that Superintendent Forsten was not available and were instructed to schedule an appointment. The Parents then requested to speak with the Assistant to the Superintendent, Ms. Linden Jackett, and were told that she was not available, either.

52. That same day, the Father called and left a message for Ms. Jackett to schedule a time to meet with Superintendent Forsten. Ms. Jackett called the Father back and told him that the investigation was closed and that the policy required the Parents to first speak with M.L.'s Principal, then the School Principal, then the Director of Student Services, and only then, if they were unsatisfied with the result, could they have a meeting with Superintendent Forsten.

53. As a result of this, on or around January 22, 2018, the Parents sent a letter to Superintendent Forsten. This letter detailed the incident that occurred on the bus as well as all subsequent interactions M.L. had with Student A, including the text messages and Student A putting himself near M.L. on the bus and at school. The letter also detailed the contact other students had with M.L. in reference to the incident. The Parents indicated that they were concerned for M.L. as she was depressed, did not feel safe at school, and had little interest in doing her school work. The Parents explained their frustrations with the school investigation and subsequent lack of follow through by school administration. The Parents then requested a meeting with Superintendent Forsten in order to discuss the situation and develop a plan to make sure M.L. felt safe and comfortable at school.

54. On or around January 24, 2018, the Parents met with Superintendent Forsten and Principal Sica to discuss the issues and concerns they raised in their earlier letter.  At this meeting, Superintendent Forsten told the Parents that she had been notified about the investigation and had regularly been informed of its status.  Later in the meeting, however, Superintendent Forsten stated that she had not been informed about M.L.'s second statement, namely the report that Student A had penetrated her with his finger on the bus.  Principal Sica also stated that he could not recall this information and would have to consult his notes.

55. During this time, M.L. still had to walk by Student A in the hallway every Monday.  She also regularly saw him in various other locations at school during her school day.

56. On or around January 25, 2018, Concord High School's administration agreed to switch M.L.'s Commons section so that she would have a female Assistant Principal.

57. On or around February 1, 2018, the Parents sent an email to Superintendent Forsten and requested an update on the status of the investigation.  They informed Superintendent Forsten that M.L. was incredibly uncomfortable at school and that she still had to pass Student A every Monday in the hallway.

58. On or around February 1, 2018, Superintendent Forsten informed the Parents, via email, that the administration at Concord High School was re-opening the investigation regarding the school bus incident and the events that were reported thereafter.

59. On or around February 2, 2018, the Parents sent an email to Superintendent Forsten, expressing their frustrations that while they had been informed that the investigation was being reopened on January 24, 2018, nothing had been done yet.  Superintendent Forsten did not respond.

60. On or around February 5, 2018, M.L. was called to Assistant Principal Davis' office to discuss text messages that Student B had received from Student A.  At this time, M.L. told Assistant Principal Davis that she was concerned about what other students in the school knew about the incident, especially students B, C, D, and E.  M.L. also told Assistant Principal Davis that she felt unsafe because she did not know where Student A would be during the day and if she might see Student A in the school.  In response, Assistant Principal Davis instructed M.L. that either she should use a particular stairwell in order to get to one of her classes or that she could go to class late in order to avoid Student A.

61. On or around February 6, 2018, in response to M.L. repeatedly reporting that she encountered Student A in the hallways and around the school building, the school psychologist, Ms. Aimee Tucker (hereinafter "Ms. Tucker"), discussed Student A's class schedule with M.L.  Ms. Tucker told M.L. what Student A's class schedule was and discussed which routes Student A might take to get to those classes to help M.L. avoid seeing Student A in the hallway.

62. On or around February 6, 2018, the Parents received an email from Principal Sica, informing them that Concord High School administration had re-opened the investigation based on M.L.'s report of sexual assault.  This email included Concord's Policy Number 539, the Bullying Policy.

63. On or around February 8, 2018, M.L. was in the cafeteria with a group of students, including Student E.  Student E was discussing April vacation and who she should ask to come on a trip with her.  She then turned to M.L. and said that she could not invite her because "you're going to be here dealing with all sorts of legal stuff."

64. On or around February 9, 2018, the Parents, through their attorney, sent a letter to Superintendent Patty Sherman, the Superintendent of Deerfield.  The Parents requested that M.L be reassigned to a different school under either RSA 193:3(I) or RSA 193:3(III). The letter also detailed the sexual assault incident, the ongoing harassment and retaliation, and Concord High School's failure to make M.L. feel safe and comfortable at school.

65. On or about February 12, 2018, M.L met again with Assistant Principal Davis and her Father.  M.L.'s Mother participated via telephone.  At the beginning of the meeting, Assistant Principal Davis told the Parents that they were not allowed to speak and she wanted M.L. to answer her questions.  During the meeting, Assistant Principal Davis asked M.L. why she moved to one particular seat on the bus instead of moving to another seat that was further away from Student A.  She also asked M.L. questions about what two other students knew about the incident.  M.L. told her "I don't know."

66. During the meeting, M.L. told Assistant Principal Davis about Student E's comment about April Vacation.

67. After the meeting, M.L. became even more depressed and withdrawn and expressed to the Parents that she felt that Assistant Principal Davis and other administrators (1) did not believe her, and (2) were blaming her for the incident.

68. M.L. also did not understand why Assistant Principal Davis asked about what other students knew because she had previously told her everything she heard and from which students.

69. On or around February 13, 2018, M.L. saw Student A's father in the cafeteria.  As he walked through the cafeteria, he stared at M.L.  M.L. immediately texted her Mother and

told her Mother that she felt uncomfortable and unsafe because Student A's father had

stared at her the entire time he walked through the cafeteria.

70. The Mother immediately called Ms. Karen Slick (hereinafter "Ms. Slick"), M.L.'s

guidance counselor to report this incident.  She left messages for Assistant Principal

Davis and Principal Sica regarding the incident.

71. Shortly thereafter, M.L. went to see her guidance counselor, Ms. Slick for a preplanned

meeting.  As she walked down the hallway, she saw Student A and his father meeting

with Assistant Principal Davis, whose office is diagonally across the hall from Ms.

Slick's office.  M.L. told Ms. Slick that she was trying to avoid Student A so Ms. Slick

called Assistant Principal Davis and asked to be notified when her meeting was over.

Towards the end of M.L.'s meeting with Ms. Slick, Assistant Principal Davis called to

inform M.L. that her meeting with Student A and his father was over and it was safe for

her to leave.

72. On or around February 15, 2018, M.L. stopped attending school because she continued to

feel unsafe and continued to see Student A in the hallways and in other areas of the

school throughout her school day.

73. On February 20, 2018, Assistant Principal Davis sent M.L. an apology letter, written by

Student E.  In this letter, Student E indicated that she had heard M.L. was involved in

legal issues.  Student E also stated that Assistant Principal Davis had discussed the

situation with Student E, as she wrote "[Assistant Principal] Davis also mentioned that I

might have made you feel like I was blaming you for whatever happened and that I might

have also made you feel like you are falsely doing something."

74. Assistant Principal Davis did not inform the Parents or M.L. that she had asked Student E to write the letter or that she was sending the letter to M.L.

75. On or around February 26, 2018, the Parents sent an email to Superintendent Forsten, requesting the written report of the administration's investigation.  The Parents also expressed their frustrations and concerns with the lack of response from the administration at Concord High School in regards to M.L.'s report of sexual assault, that M.L. was depressed, isolated and felt that the school administration was blaming her for what happened on the bus, that Concord did not comply with the timelines detailed in their Title IX and Bullying Policies, that M.L. was no longer attending school and that the Parents requested that she be allowed to be reassigned to another school under RSA 193:3.

76. On or around March 2, 2018, the Parents received a letter from Superintendent Forsten. This letter stated that the investigation into M.L.'s sexual assault was completed. According to the letter, the investigation found that Student A did initiate the sexual behavior as described by M.L. on the bus but that, more probably than not, M.L. did not indicate that she did not consent to the behavior at the time of the event.  The investigators found that M.L. first indicated that the conduct was not consensual after the conduct had already occurred, and as a result Student A did not violate the school's Title IX Policy.  However, the investigation found that Student A did violate the Bullying and Title IX Policies with regards to the following incidents:

   a.  Student A violated the no contact order by texting Student B in regards to M.L.

   b.  Student A violated Concord's prohibition of retaliation policy by threatening the bus driver, sending threatening text messages to M.L.'s friends regarding the

incident on the bus and M.L.'s report of sexual harassment, and communicating

with M.L.'s friends in a manner intended to turn them against M.L.

   c.   Student A violated the Bullying Policy by sending threatening text messages to

M.L.'s friends in regards to the events on the bus and M.L.'s report of sexual

harassment.

Superintendent Forsten also indicated that Student A would be disciplined for the

violations, but did not indicate what this discipline would entail.

77. The requirement that M.L. indicate that she did not consent to the contact at the time of

the event creates an impermissible shifting of responsibility for sexual assault and sexual

harassment from the perpetrator to the victim, which is not authorized by federal law.

78. On or around March 12, 2018, the Deerfield School Board approved M.L.'s

reassignment.  At the School Board meeting, Superintendent Patty Sherman spoke in

favor of the reassignment and said it would be in M.L.'s best interest to attend another

school.

79. On or around March 15, 2018, M.L. started attending another public school.

## V.    CLAIMS

### COUNT I
### Title IX Violation
### Sexually Hostile School Environment
### Against Defendants Concord and SAU 8

80. The Plaintiff realleges paragraphs 1-79 above and incorporates them hererin.

81. Title IX and its implementing regulations prohibit discrimination in educational programs

operated by federally funded recipients on the basis of sex.

82. Under Title IX, a recipient is defined as any state or political subdivision, any

instrumentality of a state or political subdivision, any public or private agency,

institution, organization, entity or any person that received federal funds either directly or through another recipient, and that operates an education program or activity. 34 C.F.R. § 106.2(h).

83. When a school district or educational facility, which is federally funded, becomes aware of incidents of student-on-student sexual harassment and the student perpetrator is under its disciplinary policy, it is required to take action. *Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 647 (1999).

84. Harassment that is "so severe, pervasive and objectively offensive" and prevents its victims from accessing the educational opportunities and benefits provided by the recipient school district, *id*. at 650, is considered to create a hostile school environment.

85. School Districts will be held liable for harm incurred from the hostile school environment if they act with deliberate indifference to the known harassment.

86. Within the context of Title IX, a student's claim of hostile environment can arise from a single incident. *Doe v. School Administrative Dist. No. 19*, 66 F.Supp.2d 57, 62 (1999). Additionally, evidence that a student's grades had dropped, that she had been diagnosed with depression and that she had written a suicide note as a result of the harassment has helped to satisfy the severity and pervasiveness requirements, when taken in conjunction with evidence of the actual sexual assault or harassment itself. *Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 259 (2000).

87. A recipient is considered to act with deliberate indifference when its response is "clearly unreasonable in light of the known circumstances." *Grant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (1999). Whether a response or lack thereof displays deliberate indifference inherently involves an assessment of both the seriousness and

the credibility of the complaint that put the school officials on notice. *Doe* at 64.

88. If the educational institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for the harassment. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 275–76, 118 S. Ct. 1989, 1997-99, 141 L. Ed. 2d 277 (1998).

89. While this standard does not require a school district to respond with one definitive, particular method and while a school district is not required to eradicate all sexual harassment, the school district must respond and must take steps that are reasonable in light of the known circumstances. *Vance* at 261. Additionally, where a school district has knowledge that its remedial action has been inadequate and ineffective, it must take subsequent reasonable action to eliminate the behavior. *Id.*

90. In the herein case, Concord and SAU 8 receive federal funds and are therefore recipients of federal funds as defined under Title IX. 34 C.F.R. § 106.2(h).

91. As a result, Concord and SAU 8 are required to comply with all aspects of Title IX.

92. On at least four (4) separate occasions, M.L. was formally interviewed by various administration staff at Concord High School in regards to the reports that she made regarding the sexual assault by Student A. In addition, M.L. made several other reports regarding other incidents, such as seeing Student A on the bus and in the hallways, and reported that she felt unsafe and uncomfortable at school and had concerns about Student A and other students on campus.

93. As a result of this, M.L.'s grades dropped, she became depressed, became disinterested in school work, felt unsafe and uncomfortable and, ultimately, stopped attending school and was reassigned to another public school. The sexual harassment and sexual assault were

sufficiently severe and pervasive that they created a sexually hostile environment and prevented M.L. from accessing the educational opportunities provided by Concord High School.

94. As reference above, Concord and SAU 8 had actual knowledge of the incidents because M.L. reported them to Concord High School staff and because, on more than one occasion, the Parents wrote letters and emails to Superintendent Forsten, detailing the incidents.  Superintendent Forsten also had a meeting with the Parents and wrote the Parents letters and emails regarding the investigations into the sexual assault and sexual harassment incidents.

95. Moreover, all of the individual Defendants, Superintendent Forsten, Principal Sica, Assistant Principal Crumrine, Assistant Principal Davis and Assistant Principal Corkum, had actual knowledge of the incidents because M.L. reported them to Concord High School administration, M.L. was interviewed by the administration regarding the incidents and they, ultimately, investigated M.L.'s reports.

96. Despite this, Concord, SAU 8, Superintendent Forsten, Principal Sica, Assistant Principal Davis, Assistant Principal Crumrine and Assistant Principal Corkum did not appropriately and timely investigate the incidents of sexual assault and sexual harassment and did not take appropriate steps to eliminate the sexual assault and sexual harassment, prevent reoccurrence of the sexual assault and sexual harassment or address the effects that the sexual assault and sexual harassment had on M.L.

97. The Defendants' responses to the reported incidents of sexual assault and sexual harassment were clearly unreasonable in light of the circumstances and constituted deliberate indifference.

98. As a result of the Defendants' repeated failures to (1) appropriately and timely investigate the incidents of sexual assault and sexual harassment; (2) take appropriate action to eliminate the sexual assault and sexual harassment; (3) prevent reoccurrence; and (4) address the effects that the sexual harassment and sexual assault had on M.L., she was unjustly, and on a discriminatory basis, denied equal educational opportunities and benefits provided by Concord and SAU 8.

99. As a result M.L. suffered and will continue to suffer from psychological harm, emotional harm, physical pain and suffering and forced her to relocate to another school, midway through the school year, for which they are liable.

**COUNT II**
**42 U.S.C. § 1983**
**Against Defendants Concord and SAU 8**

100. The Plaintiff realleges paragraphs 1-99 above and incorporates them herein.

101. M.L. had a constitutional and statutory right to have equal access to public education, without regard to her sex, pursuant to 42 U.S.C. § 1983.

102. The Defendants, Concord and SAU 8, were state actors acting under of color of law.

103. The Defendants acted with the intent, as expressed by (a) their deliberate indifference to known acts of sexual assault and sexual harassment that M.L. suffered; and (b) their failure to adequately train and supervise the Defendants, Superintendent Forsten, Principal Sica, Assistant Principal Crumrine, Assistant Principal Davis and Assistant Princiapl Corkum, leading to a violation of these constitutionally and statutorily protected rights.

104. This deliberate indifference and lack of response to known acts of sexual assault

and sexual harassment were the result of a custom, policy and practice of Concord and SAU 8, which also led school district administrators to apply an incorrect standard that focuses on the victim's actions, instead of on the perpetrator.

105.  As a result of the Defendants' conduct, M.L. has suffered from and will continue to suffer from psychological harm, emotional harm and physical pain and suffering for which Concord and SAU 8 are liable.

**COUNT III**
**42 U.S.C. § 1983**
**Against Defendants Superintendent Forsten, Principal Sica, Assistant Principal Crumrine, Assistant Principal Davis and Assistant Principal Corkum**

106.  The Plaintiff realleges paragraphs 1-105 above and incorporates them herein.

107.  M.L. had a constitutional and statutory right to have equal access to public education, without regard to her sex, pursuant to 42 U.S.C. § 1983.

108.  The Defendants, Superintendent Forsten, Principal Sica, Assistant Principal Crumrine, Assistant Principal Davis and Assistant Principal Corkum, were state actors acting under of color of law.

109.  The Defendants failed to timely and appropriately investigate M.L.'s reports of sexual assault and sexual harassment.  Moreover, when the Defendants finally investigated the reports, approximately three months later, they failed to apply the correct standard and instead focused on the victim's actions, instead of on the perpetrator.

110.  The Defendants acted with the intent, as expressed by their deliberate indifference to known acts of sexual assault and sexual harassment M.L. suffered, to violate these constitutionally and statutorily protected rights.

111.  As a result of the Defendants' conduct, M.L. has suffered from and will continue to

suffer from psychological harm, emotional harm and physical pain and suffering for which

they are liable.

112.   The Defendants' conduct constituted reckless or callous indifference to the Plaintiff's

federally protected rights and, as a result, M.L. is entitled to punitive damages.

## COUNT IV
### Negligence
**Against Defendants Superintendent Forsten, Principal Sica, Assistant Principal Crumrine,
Assistant Principal Davis and  Assistant Principal Corkum**

113.   The Plaintiff realleges paragraphs 1-112 above and incorporates them herein.

114.   The Defendants, Superintendent Forsten, Principal Sica, Assistant Principal Crumrine,

Assistant Principal Davis and Assistant Principal Corkum, had a duty to provide M.L.

with an educational atmosphere free from sexual harassment and sexual violence.

115.   The Defendants also had a duty to reasonably supervise M.L. and all students within

their care.

116.   The Defendants breached these duties when they failed to (a) reasonably supervise

M.L.; (b) appropriately investigate M.L.'s reports regarding sexual assault and ongoing

sexual harassment; (c) take appropriate action to address M.L.'s reports; (d) prevent

reoccurrence of sexual assault and sexual harassment; and (e) address the effects that the

sexual assault and sexual harassment had on M.L.

117.   In breaching these duties, the Defendants failed to act in good faith.

118.   As a direct and proximate result of the Defendants' breach of these duties, M.L. has

suffered and will continue to suffer from psychological harm, emotional harm and physical

pain and suffering for which they are liable.

119.   The injuries, damages and harm that M.L. suffered were probable and reasonably

foreseeable to the Defendants.

120. The Defendants' actions constitute gross negligence in that they acted with reckless disregard and, as a result, M.L. is entitled to enhanced compensatory damages.

## VI. ATTORNEYS FEES

121. Pursuant to 28 U.S.C. §1988, the Plaintiff is requesting an award of reasonable attorney's fees.

## VII. JURY DEMAND

122. The Plaintiff demands a jury trial.

## VIII. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for the following relief:

i. Enter a declaratory judgment that the conduct set forth above is unlawful and in violation of state and federal law;

ii. Enter judgment in the Plaintiff's favor on the claims against the Defendants, the exact amount to be proven at trial;

iii. Award the Plaintiff damages to compensate them for the injuries they suffered and will continue to suffer from as a result of the Defendants' unlawful actions, the exact amount to be proven at trial;

iv. Award the Plaintiff enhanced compensatory damages, the exact amount to be proven at trial;

v. Award the Plaintiff punitive damages, the exact amount to be proven at trial;

vi. Award the Plaintiff reasonable expenses incurred in this litigation, including attorney and expert fees and costs;

vii. Enjoin the Defendants from permitting any further acts of sexual assault and sexual harassment against the Plaintiff, M.L., either on school property or in any

educational program that she is placed in by the Defendants; and

viii.  Grant any other relief that this Court deems just and equitable.

Respectfully Submitted,


/s/ Karen E. Hewes
Karen E. Hewes (# 20095)
EdLaw New England, PLLC
khewes@edlawne.com
50 Bridge Street, Suite 203
Manchester, NH 03101
(603) 695-6557
(603) 695-6558

**ATTORNEY FOR THE PLAINTIFFS**