UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>M.L., a minor, by and through
her father and next friend, D.L.</u>

     v.                                 Case No. 18-cv-327-PB
                                               Opinion No. 2022 DNH 122

<u>Concord School District et al.</u>

<u>MEMORANDUM AND ORDER</u>

Plaintiff M.L., a former student at Concord High School, has sued the Concord School District and School Administrative Unit 8 under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). M.L. alleges that defendants failed to timely and adequately respond when she reported an incident of peer-on-peer sexual assault and later complained about the alleged perpetrator's retaliatory behavior. Defendants have moved for summary judgment. Because M.L. cannot show that defendants were deliberately indifferent in their handling of her complaints, I grant the School District's motion.

<h2 style="text-align:center">I.     <u>BACKGROUND</u></h2>

M.L. was a resident of Deerfield, New Hampshire, a town some twenty miles east of Concord. Like many other Deerfield students, M.L. attended Concord High School (CHS) pursuant to a tuition agreement between the two

towns. The event that gave rise to this case occurred during an hour-long bus ride from CHS to Deerfield on November 29, 2017.

## A.    Initial Report of Sexual Misconduct

On the evening of November 29, Marie Bolster, a school bus driver, notified M.L.'s father that she had observed an incident involving M.L. and another student, L.M., on the bus that afternoon. Although Bolster did not elaborate, she told M.L.'s father that M.L. did not appear to be her normal self when she got off the bus. When her father asked M.L. if something had happened on the bus, she burst into tears. She later told him that L.M. had acted inappropriately toward her.

The next day, M.L.'s father called James Corkum, M.L.'s Assistant Principal (AP)[1], to report that something had occurred between M.L. and L.M. on the bus the day before. Corkum responded that he would immediately discuss the incident with M.L. and involve the School Resource Officer (SRO), Mark Hassapes. After the call, Corkum and Hassapes spoke with M.L. In a written statement, M.L. stated that L.M. had kissed and touched her without her consent. She reported that L.M. had sat with her near the back of the bus and kept his hand on her leg and thigh during most

---

[1]    At the time, CHS students were separated into groups referred to as "Commons." Each Commons was assigned an assistant principal, an administrative assistant, two school counselors, and a program assistant. M.L. was in Commons B, and L.M. in Commons A.

of the ride. M.L. stated that she moved up a seat after some other students exited the bus, but L.M. again joined her. According to M.L., toward the end of the ride, L.M. started kissing her, moved his hand up her thigh to the belt of her jeans, and repeatedly touched her chest over her clothes for a few minutes, until the bus driver noticed that something was going on and called for L.M. to find another seat. Doc. No. 37-9 at 2.

After hearing M.L.'s account of the incident, Corkum, Hassapes, and Thomas Crumrine, L.M.'s AP, spoke with L.M. L.M. told them that M.L. was his best friend, that she kissed him on the cheek on the bus, which led him to believe they were attracted to one another, and that they held hands for the remainder of the ride. In his written statement, however, L.M. stated that they kissed on the bus, during which his hands were likely on her hand or waist. According to L.M., the bus driver then yelled at him, which prompted him to tell the driver as he was exiting the bus that she should not accuse him of something without knowing all the facts. Doc. No. 37-8 at 10.

Later that day, L.M. approached SRO Hassapes and asked if they could speak "man to man." Doc. No. 37-8 at 11. L.M. then said that more had happened than just a kiss, that he knew what he had done was wrong, and that he had apologized to M.L. In response, AP Crumrine met with L.M. and asked him to explain his comment to Hassapes about being in the wrong. L.M. responded that he meant that both he and M.L. had realized that the

3

kiss was not something they wanted. Doc. No. 37-8 at 13. Crumrine, however, did not specifically ask L.M. to explain what he meant when he said that more had happened than just a kiss.

Meanwhile, that same day, AP Corkum spoke with several other students who were on the same bus, all of whom denied seeing anything occur between M.L. and L.M. AP Crumrine also informed L.M.'s father of the allegations. His father noted that the bus driver was a neighbor with whom he had a feud.

At the end of the day, Corkum, Crumrine, and Hassapes met with Principal Thomas Sica to advise him of the incident. They decided not to open a formal sexual harassment investigation at that point given the lack of evidence to corroborate M.L.'s story and L.M.'s clean disciplinary record. They also believed that M.L.'s father did not want a formal investigation, although M.L.'s father denies communicating as much to any school official.

A few days later, Principal Sica received a written statement concerning the incident from Bolster, the bus driver. Bolster wrote that she saw in the rearview mirror what appeared to be L.M.'s head above M.L.'s head moving in a motion that resembled "making out." Doc. No. 37-7 at 2. According to the statement, Bolster then saw L.M.'s rear end sticking out into the aisle, as if he were in a crawling position on the seat, before "the making out moves" resumed. Doc. No. 37-7 at 2. Bolster stated that she had

instructed L.M. to move to another seat twice, but he ignored her instructions. Shortly thereafter, as M.L. was getting off the bus, Bolster noted that M.L. appeared rigid, unlike her typical, more relaxed demeanor. Later, when it was L.M.'s turn to get off the bus, Bolster wrote that he had tried to intimidate her, telling her that she needed to get her facts straight and that he planned to keep sitting with M.L. He then threatened to report to the bus company that the length of his ride was over the legal limit if Bolster said anything.

Bolster's written statement did not change the school officials' decision not to proceed with a formal sexual harassment investigation at that time.

## B.   First Sexual Misconduct Investigation

On December 5, M.L. submitted a second written statement alleging that L.M. had attempted to contact her father following the bus incident. She added that she believed L.M. was following her at school because she was seeing him in unusual places. She also complained that, earlier that day, L.M. had moved his seat on the bus to be closer to where she was sitting, despite the bus driver's prior instruction that he should sit in the back.

That same day, the school launched a formal sexual harassment investigation of the bus incident and L.M.'s subsequent conduct. AP Crumrine was put in charge of the investigation. He immediately told L.M. that he was not to have any contact with M.L., including on the bus, in

person, or over social media. <u>See</u> Doc. No. 37-8 at 15. Crumrine also scheduled a meeting with L.M. and his father for the next day.

The next morning, M.L. and her mother came to school and asked to speak with a female administrator because M.L. found it difficult to discuss the bus incident with men. When AP Chali Davis met with them, M.L. revealed for the first time that L.M. had digitally penetrated her and touched his genitals during the bus ride. She explained that she froze during the assault but texted L.M. the following day to tell him that she was not comfortable with what had happened and no longer wished to be friends. According to M.L., L.M. responded to her text by saying that he knew he had gone too far. Lastly, M.L. reiterated that L.M. had tried to get close to her on the bus the day before.

M.L. told Davis that she did not want to be on the same bus as L.M. or to see him at school, and that she wanted to stay in places on the school grounds where she felt comfortable. M.L. added that she had been going to the library to avoid seeing L.M. during lunch but would prefer to be in the cafeteria. Davis thought that M.L. was truthful in her account of the incident. After the meeting, Davis introduced M.L. and her mother to a student assistance counselor, who offered counseling services to M.L.

After AP Davis shared M.L.'s new allegations with her colleagues, AP Crumrine and Principal Sica interviewed L.M. in his father's presence. L.M.

was adamant that nothing resembling M.L.'s story had occurred. Meanwhile, AP Corkum met with four students who were on the same bus and obtained written statements from two of them. Although none of the students witnessed the incident, one of them, J.O., stated that L.M. and M.L. were often flirtatious and physical on the bus and had kissed on a few occasions. See Doc. No. 37-8 at 17.

That same day, school officials referred M.L.'s sexual assault allegation to the Deerfield Police Department. They also obtained partial footage of the day of the incident from the bus's video monitoring system. The video was low quality. One segment showed M.L. and L.M. sitting together right before the alleged assault, but it did not enable the investigators to determine whether there had been any physical contact between them. The footage confirmed, however, that Bolster, the bus driver, had twice asked L.M. to find a different seat, to no avail. Another video segment showed L.M. as he exited the bus and captured his dialogue with Bolster. It confirmed Bolster's account that L.M. was being confrontational and threatened to report her to the bus company over the length of his ride.

A few days later, on December 11, the school obtained the full video of the bus ride, which again was low quality. AP Corkum watched the full video and summarized its contents. According to his summary, the video showed that M.L. and L.M. were sitting in the same seat for most of the ride. About

7

five minutes before M.L.'s bus stop, L.M. moved up one seat, and M.L. followed to the seat across the aisle from his. He then joined her in that seat and appeared to lean in toward her. Next it appeared that she was leaning toward him and then again that he was leaning toward her, until the bus driver addressed him. In his deposition, Corkum described the video as inconclusive and noted that the height of the bus seats made it difficult to discern what was occurring.

Later that day, AP Crumrine finalized his report of the first sexual harassment investigation. The December 11 report concluded that L.M. (1) had violated the school's sexual harassment policy by initiating "unwanted physical contact" when he kissed M.L. and put his hand on her thigh or waist, and (2) had been insubordinate to the bus driver. Doc. No. 37-17. As a result, L.M. was suspended from the bus for ten days, assigned a seat at the front of the bus going forward, and given a written order directing him not to contact M.L. in any manner. The no-contact order prohibited both direct and indirect contact, defined broadly to include gestures, texting, calling, Facebook, Twitter, Instagram, and communications via a proxy. Doc. No. 37-18. If the two ended up in the same physical space, the order instructed L.M. to stay at least ten feet away from M.L. and avoid any contact, or else remove himself from the situation. The order warned L.M. that failure to comply could result in suspension or other penalties.

In early January 2018, M.L. informed AP Corkum that she had seen L.M. in the elevator hallway where she was hanging out in the mornings. In response, AP Crumrine spoke with L.M., determined that he was in the area for legitimate reasons, and told him to avoid that location in the future.

## C.   Second Sexual Misconduct Investigation

On January 19, the Deerfield Police Department informed M.L.'s parents that they were not going to bring charges against L.M. stemming from the bus incident. Three days later, her parents sent a letter to the Concord School District Superintendent Terri Forsten, setting forth their version of what they believed happened on the bus and requesting a meeting.

Forsten met with M.L.'s parents the following week. They made her aware of a text exchange that took place in December between L.M. and A.C., a friend of M.L.'s, where L.M. seemed to threaten M.L. by proxy. In the text messages, L.M. suggested that M.L.'s allegations against him were lies, that M.L. would learn what it was like to have someone ruin her life, and that it was "burying time." Doc. No. 41-21. This was the first time a school official had been told about these texts. M.L.'s parents also informed Forsten that L.M.'s girlfriend was telling other students that L.M. had gone too far on the bus and that M.L. was suing him for rape. Lastly, M.L.'s parents informed Forsten that M.L. would pass L.M. in the hallways before math class on Mondays, that she had not ridden the bus since his bus suspension had

ended, and that she wanted alternative transportation. Forsten told M.L.'s parents that the school would re-open its investigation into the bus incident and L.M.'s subsequent behavior. She assigned AP Davis to lead the second investigation.

The next day, M.L. was reassigned to Commons D, which had all female administrators, so that she could feel more comfortable and supported. Davis, M.L.'s new AP, introduced M.L. to a new school counselor and asked her teachers to give her extra time to finish her coursework.

The following week, M.L. and her mother complained to the school that M.L. was still seeing L.M. on Mondays before math class because L.M. had the same math teacher and his class was right before hers. Davis met with M.L. a few days later and provided her with options on how to avoid seeing L.M. before math class. M.L. elected one route to travel to class, and L.M. was told to use an alternate route. The math teacher, however, was not told about the no-contact order.

The next day, M.L. reported to Davis that L.M. had passed by the elevator hallway where she was sitting in the morning. AP Crumrine met with L.M. that same day, told him to avoid the elevator hallway, reminded him that the no-contact order remained in effect, and explained the order to him.

Later that day, Principal Sica wrote a letter to M.L.'s parents to formally notify them that the bus incident investigation had been re-opened. The letter also informed them that the school would investigate allegations that L.M. may have violated the no-contact order or otherwise retaliated against M.L. Lastly, the letter noted that L.M. had been told both to have no contact with M.L. and "that retaliation against anyone who raises a concern or participates in an investigation is strictly prohibited." Doc. No. 37-20.

Shortly after, M.L.'s mother reported that L.M.'s father had "stared down" M.L. when he ran into her on the school grounds. AP Davis met with M.L. later that day to discuss the incident.

Davis conducted her investigation over the next few weeks. She interviewed numerous students, including M.L., L.M., S.D. (L.M.'s girlfriend), A.C. (M.L.'s friend who had received L.M.'s "burying time" texts), and J.O. (the student who had described M.L. and L.M. as flirtatious and physical on the bus). At that time, S.D. shared with Davis text messages that L.M. had sent her right after the bus incident, where he stated that he felt "sick to [his] stomach" as if he had done "something horrible," that he was afraid of losing her, and that he was often losing those he cared about because he would do "something wrong to them." Doc. No. 37-22 at 9-11. Davis later re-interviewed L.M. and asked him about those texts. He explained that he was

11

highly upset at the time because of multiple challenging issues in his life, including his grandmother's car accident and a friend's betrayal.

As part of her investigation, AP Davis viewed the bus video footage numerous times and created a chart comparing the footage and M.L.'s allegations. On one occasion, she viewed the footage on a bus company laptop, which had slightly better quality than the version the school had received. In reviewing that video, Davis noticed that, when the alleged assault occurred, M.L.'s hands appeared "to be reaching out to [L.M.'s] head – not to push away, but to pull [him] toward her." Doc. No. 37-21 at 2. The clearer image also showed M.L. leaning toward L.M. during the physical interaction. Davis shared her observations with SRO Hassapes and AP Crumrine, who also viewed the better version of the bus video and agreed with her observations. See Doc. No. 37-21 at 7; Doc. No. 47 at 80-81.

AP Davis submitted a report of her investigation to Superintendent Forsten on February 22. Davis concluded that the first investigation's finding that L.M. had made unwanted physical contact with M.L. on the bus was unsubstantiated. Instead, Davis found it "impossible to conclude" that the physical interaction was "non-consensual." Doc. No. 37-21 at 3. According to Davis, the bus video pointed to M.L.'s willing participation in an "intense physical interaction." Doc. No. 37-21 at 3. Davis cited M.L.'s reaching maneuver pulling L.M. toward her and her leaning toward L.M. during the

alleged assault, as well as the fact that M.L. had switched seats to be closer to L.M. after he had moved away from their first shared seat. Davis found the seat switching to contradict M.L.'s statement that she was uncomfortable in the first shared seat because L.M. had kept his hand on her leg and thigh. In Davis's view, M.L.'s credibility was further undermined because she was not forthright about either the seat switching or the nature of her friendship with L.M., including their prior consensual kissing on the bus. Davis likewise did not find L.M. credible because the video contradicted his claim that M.L. had initiated the kissing.

Davis elected not to interview the bus driver and she did not credit her written statement describing the incident, principally because it did not match the video footage. Contrary to the bus driver's account, Davis did not see L.M.'s body extending out into the aisle in a crawling position and, to Davis, M.L.'s movements on the bus appeared relaxed, not rigid. Further, Davis noted that the bus driver had not disclosed the fact that she had admonished M.L. as she exited the bus by stating, "Different seats next time." Doc. No. 37-21 at 3. Lastly, Davis noted that the bus driver appeared to be vindictive toward L.M. because he had threatened her at the end of the ride.

A few weeks later, Superintendent Forsten wrote to M.L.'s parents with a summary of the findings of the second investigation. According to the letter,

the investigation found that L.M. had initiated sexual behavior on the bus ride, including kissing, touching M.L. over and under her clothing, and touching himself. The investigation found, however, that it was more probable than not that M.L. "did not indicate that this conduct was unwelcome at the time of the event," and that, therefore, L.M. did not violate the school's sexual harassment policy. Doc. No. 37-24 at 3-4. But the letter noted that L.M. had violated the no-contact order, the school's bullying policy, and the prohibition against retaliation in the school's sexual harassment policy when he texted M.L.'s friend A.C. in an attempt to use her as his proxy to contact and intimidate M.L. As a result of those violations, L.M. was given a four-day suspension and required to engage in four meetings with his school counselor. M.L. transferred to another school shortly thereafter.

A few months later, M.L.'s father filed this lawsuit on M.L.'s behalf to recover damages for injuries she suffered because of defendants' alleged failure to properly investigate M.L.'s reports. Although the complaint initially asserted four counts and named various school officials as defendants, plaintiff later voluntarily dismissed three of those counts. The only remaining claim is asserted under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), against the two institutional defendants. Those defendants have moved for summary judgment on the Title IX claim, and plaintiff has objected.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (cleaned up). A "genuine dispute" exists if a jury could resolve the disputed fact in the nonmovant's favor. Ellis v. Fidelity Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016). Once the movant has properly presented such evidence, the burden shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in its favor." Flovac, 817 F.3d at 853 (cleaned up). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. See id. In considering the evidence presented by either party, all reasonable inferences are to be drawn in the nonmoving party's favor. See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.   ANALYSIS

M.L. claims that defendants are liable for damages under Title IX because their inadequate response to her reports of peer-on-peer sexual assault, harassment, and retaliation caused her significant emotional harm. Defendants argue that they are entitled to summary judgment because they promptly, fully, and fairly investigated plaintiff's reports and implemented adequate protective measures in the interim, leaving a reasonable jury with no evidence to find them liable under Title IX. Plaintiff objects to summary judgment on the grounds that defendants' investigation was fatally flawed and that they failed to adequately protect her from her harasser. There is no disagreement, however, on the applicable law.

Under Title IX, a school that receives federal educational funding is liable for damages when it is "deliberately indifferent to known acts of harassment in its programs or activities, including severe and pervasive acts of harassment perpetrated by fellow students in circumstances under the recipient's substantial control." Doe v. Pawtucket Sch. Dep't, 969 F.3d 1, 7 (1st Cir. 2020) (citing Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 644-46 (1999)). Deliberate indifference in this context requires a showing that the school's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Porto v. Town of Tewksbury, 488 F.3d 67, 72 (1st Cir. 2007) (quoting Davis, 526 U.S. at 648). This is "a stringent

16

standard of fault," which requires proof that the school "disregarded a known or obvious consequence of [its] action or inaction." Id. at 73 (cleaned up). A single incident of pre-notice, peer-on-peer harassment may trigger Title IX liability "if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program of activity." Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 172-73 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 246 (2009). But see Doe v. Fairfax Cnty. Sch. Bd., 10 F.4th 406, 417 (4th Cir. 2021) (Wilkinson, J., dissenting) (noting ambiguity in the statutory language and a circuit split on this issue).

A school satisfies its obligation under Title IX if it makes reasonable efforts to investigate and address peer-on-peer harassment. See Fitzgerald, 504 F.3d at 175. The statute does not require schools "to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents." Id. at 174. In order words, "a claim that the school system could or should have done more is insufficient to establish deliberate indifference." Porto, 488 F.3d at 73. A court may not, with the benefit of hindsight, "second-guess an educational institution's choices from within a universe of plausible investigative procedures." Fitzgerald, 504 F.3d at 175. Instead, a court must inquire whether the

school's response was objectively "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." Id.

Defendants' motion for summary judgment focuses solely on the deliberate indifference element of the Title IX claim. They argue that the school's response to M.L.'s reporting of L.M. for sexual assault, harassment, and retaliation, was not clearly unreasonable under the circumstances. Defendants maintain that they took appropriate steps to protect M.L. and conducted adequate investigations of her allegations. Plaintiff challenges both assertions.

## A.     Adequacy of the School's Actions to Protect M.L.

In terms of the school's efforts to protect M.L., defendants point to evidence that they issued an informal no-contact order to L.M. as soon as they opened the first investigation and then sent him a formal no-contact order that remained in place throughout the relevant period. On the two occasions that M.L. reported passing L.M. in the elevator hallway, school officials immediately met with L.M., ascertained that he had legitimate reasons to be there, and warned him to stay away from that location. Upon learning that M.L. and L.M. were regularly in close proximity when L.M. was making her way to math class on Mondays, school officials assigned the students different routes to travel for that period. Finally, after M.L.'s mother reported that L.M.'s father had "stared down" M.L. one time on the school

grounds, AP Davis met with M.L. to get more facts. Defendants note that, although the school did not take concrete steps to ensure that it did not happen again, it was deemed to be an isolated incident that was unlikely to reoccur.

I agree with defendants that the evidence, even construed in the light most favorable to plaintiff, cannot show that they were deliberately indifferent in their attempts to protect M.L. The no-contact orders were reasonably broad in scope, prohibiting both direct and indirect contact, including on social media and via a proxy. That a handful of instances of contact occurred between M.L. and L.M. is insufficient to show that the no-contact orders were not "reasonably calculated to end the harassment." See Doe v. Oyster River Co-op. Sch. Dist., 992 F. Supp. 467, 480 (D.N.H. 1997); see also Porto, 488 F.3d at 74 ("[T]he fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by [the school] at the time."). For the most part, the no-contact orders effectively kept the two students separated. When M.L. or her parents reported potential violations of the no-contact orders, defendants responded with reasonable promptness to remedy the situation. Nor is there any evidence that the limited contact that occurred in the elevator hallway and before math class

involved deliberate attempts on L.M.'s part to contact M.L. such that a different response may have been required.

Plaintiff's challenges to the adequacy of the school's other protective actions also fail to persuade. Plaintiff argues that additional measures were required, including a comprehensive safety plan, separate transportation, notice to the math teacher of the no-contact order, and a solution that would have enabled M.L. to eat lunch in the cafeteria without seeing L.M. Plaintiff also contends that the school's delay in addressing both the "burying time" texts and the run ins before math class was clearly unreasonable.

To be sure, the additional measures M.L. has identified were available to defendants, and M.L.'s parents did demand some of them. But Title IX "does not require an educational institution either to assuage a victim's parents or to acquiesce in their demands." Fitzgerald, 504 F.3d at 175. Considering the whole record, no reasonable jury could conclude that plaintiff's unaddressed demands show deliberate indifference by defendants.

As for the transportation, the school acted reasonably when it created a physical distance between the two students by instructing L.M. to ride at the front. Defendants' failure to notify the math teacher of the no-contact order was also not clearly unreasonable, considering that the two students were

assigned different travel paths to avoid contact before math class.[2] And as for the cafeteria situation, plaintiff's counsel admitted at oral argument that there is no evidence in the record that M.L. and L.M. shared the same lunch period or that she ever ran into him in the cafeteria. But even if they had shared a lunch period, the no-contact orders would have required L.M. to keep his distance from M.L. Defendants' alleged failure to address her request to avoid seeing L.M. at lunch, therefore, cannot show that defendants' actions were clearly unreasonable.

Defendants' alleged delay in addressing the "burying time" texts also does not establish deliberate indifference. Approximately six weeks after getting notice of those texts, the school concluded that M.L. had violated the no-contact order and various school policies by sending them. L.M. was suspended from school for four days as a result. That the school decided to wait until its second investigation was completed to impose consequences for those violations does not make its efforts to protect M.L. clearly unreasonable. Shortly after the texts came to the school's attention, the school advised M.L.'s parents that it was investigating them and informed them that it had specifically warned L.M. that retaliation against M.L. or

---

[2]     Plaintiff notes that the travel paths were imperfect because there was still a possibility that they would intersect depending on which stairwell L.M. took. But there is no evidence that their paths in fact crossed on any occasion.

others who participate in the investigation was strictly prohibited. Plaintiff's position that the school instead should have immediately confronted L.M. with the texts and disciplined him to protect M.L. from further retaliation amounts to a mere allegation that the school "could or should have done more," which, standing alone, cannot constitute deliberate indifference. See Porto, 488 F.3d at 73. Regardless, considering the lack of evidence that L.M. engaged in further retaliation after receiving the warning, it is not even clear that additional measures were needed to protect M.L. from further retaliation.

Lastly, the school's delay in addressing the run ins before Monday's math class was not clearly unreasonable. Although an unjustified delay in instituting remedial actions may constitute deliberate indifference, a delay of a few weeks resulting in, at most, a handful of contacts between M.L. and L.M. cannot meet that standard. Cf. Karasek v. Regents of Univ. of Cal., 956 F.3d 1093, 1109-10 (9th Cir. 2020); Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 669 & n.13 (2d Cir. 2012).

In sum, no reasonable jury could conclude based on the evidence in the summary judgment record that defendants were deliberately indifferent in their attempts to protect M.L. Accordingly, defendants are entitled to summary judgment as to that aspect of M.L.'s Title IX claim.

## B.   Adequacy of the School's Investigations

As for the school's investigations into M.L.'s allegations, defendants point out that school officials spoke with both M.L. and L.M., as well as several other students who were on the bus, the same day that M.L.'s father first reported the bus incident. Based on the available information, they decided not to proceed with a formal sexual harassment investigation at that time. But as soon as M.L. reported L.M.'s attempts to contact her a few days later, the school opened a formal investigation. Then, when M.L. reported that she had been digitally penetrated, school officials referred the allegation to the police. They also continued their investigation by re-interviewing L.M. in his father's presence, obtaining video footage of the bus ride, and re-interviewing students who were on the same bus. The bus video, however, was poor quality, limiting the school officials' ability to ascertain what had really happened. Based on the information they had available, which included an admission from L.M. that he had kissed M.L. and placed his hands on her waist, the school determined on December 11 that the unwanted kissing constituted unwanted physical contact in violation of the school's sexual harassment policy and that L.M. had been insubordinate to the bus driver when she had tried to intervene. As a result, L.M. was suspended from the bus for ten days, assigned a seat at the front of the bus, and issued a formal no-contact order.

Defendants maintain that this first investigation alone satisfied the school's obligations under Title IX. Nonetheless, when M.L.'s parents provided the school with additional facts, including L.M.'s attempt to intimidate M.L. by proxy, the school agreed to conduct a second investigation. A new investigator, AP Davis, was assigned to lead that investigation. According to defendants, Davis conducted a thorough investigation, which included re-interviewing L.M., M.L., and numerous other students; reviewing text messages that allegedly violated the no-contact order, as well as additional text messages from L.M. to his girlfriend following the bus incident; and reviewing the bus video numerous times, including a better-quality version that most others did not see. Davis then wrote a report outlining her findings, essentially concluding that no unwanted touching had taken place because M.L. was a willing participant. Superintendent Forsten then wrote a letter to M.L.'s parents detailing the second investigation's findings. Although the letter concluded that there was insufficient evidence that L.M.'s conduct was unwanted, it nonetheless found that he had violated the no-contact order and school policies by threatening M.L. in the "burying time" texts. As a result of those violations, the school suspended L.M. for four days, which defendants maintain was adequate punishment.

I agree with defendants that, on this record, no reasonable jury could conclude that they were deliberately indifferent in investigating M.L.'s

allegations. To be clear, this was far from a perfect investigation. More could have been done, and a reasonable investigator may well have come to different conclusions. But I cannot say that the investigation was "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." See Fitzgerald, 504 F.3d at 175.

Plaintiff's challenges to the school's investigations do not identify fatal flaws. Plaintiff first notes that school officials never interviewed Bolster, the bus driver, despite her being the only witness to the bus incident. Defendants also did not interview the school counselor who was helping M.L. in the wake of the bus incident and who thought that M.L. was being honest about the assault. Defendants respond that they had Bolster's written statement and that they had valid reasons to discount her account of what had happened, which conflicted with the video footage. As for the counselor, defendants argue that M.L.'s sessions with her were confidential.

Perhaps defendants should have interviewed Bolster instead of relying on her written statement, and they could have asked the counselor for her opinion without asking her to divulge confidential information. But, under the circumstances, defendants' failures to do so does not rise to the level of deliberate indifference. See Fitzgerald, 504 F.3d at 174 (noting that "[i]n hindsight, there may be other and better avenues that the [school] could have explored . . . [b]ut Title IX does not require . . . flawless investigations [or]

25

perfect solutions"); see also Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 407 (1997) (explaining that "[a] showing of simple or even heightened negligence will not suffice" under the deliberate indifference standard).

Nor does plaintiff's contention that the investigators should have posed better questions to some witnesses demonstrate deliberate indifference. Although L.M. was not specifically asked after his "man to man" conversation with SRO Hassapes what he meant when he said that more had happened than just a kiss, the school did not ignore that conversation. Instead, AP Crumrine met with L.M. to follow up on his comments to Hassapes and asked about a different statement L.M. had made — that he had done something wrong. A failure to ask other questions that, in hindsight, might have elicited more illuminating answers does not show that the investigation was "carried out so inartfully as to render it clearly unreasonable." See Fitzgerald, 504 F.3d at 175. The same is true regarding questions that Davis asked L.M.'s girlfriend.

Plaintiff's argument that the school's delay in starting the second investigation shows deliberate indifference also cannot succeed. Under the circumstances, it was not clearly unreasonable for the school to wait approximately six weeks until the police completed their investigation into the sexual assault allegations to conduct the second investigation. See

26

Karasek, 956 F.3d at 1101, 1109-10 (holding that the university's decision to delay investigation for several months while police were investigating plaintiff's allegations did not constitute deliberate indifference); I.F. v. Lewisville Indep. Sch. Dist., 915 F.3d 360, 376 (5th Cir. 2019) (delaying investigation for nearly three months, which included a three-week period while police were investigating, insufficient to show deliberate indifference). In the interim, the no-contact order was in effect and being enforced and defendants took steps to support M.L., including offering counseling services.

M.L.'s attacks on the investigation's factual findings fare no better. She first maintains that the investigators should have placed more weight on L.M.'s texts to his girlfriend because they amounted to an excited utterance. Although another investigator may well have read those texts differently, Davis had a rational basis to discount them given L.M.'s explanation that his comments referred to other events in his life causing him stress.

Lastly, to the extent M.L. challenges Davis's factual finding that she had reached out to pull L.M. toward her during the assault, that argument is meritless. M.L. principally bases this challenge on the low quality of the bus video. Although the video itself is not part of the summary judgment record, M.L. cites to the testimony of several witnesses who, plaintiff claims, did not see what Davis saw.

The problem for M.L. is that Davis testified to seeing a better-quality video on the bus company's laptop, which the parties did not preserve. Two of the witnesses, Corkum and Forsten, did not testify to seeing the same version as Davis, so their testimony is not helpful in seeking to determine what the better-quality video showed. The testimony of Crumrine, who did see the same version as Davis, is not inconsistent with Davis's finding. In fact, Crumrine testified that Davis had pointed out to him the arm and head movements in the video and that he had agreed with her assessment at that time. It is true, as plaintiff notes, that Crumrine stands by his original conclusion that L.M. engaged in unwanted kissing and touching over clothing. That Crumrine may have drawn different conclusions based on all the available evidence, however, does not mean that Davis's conclusion was clearly unreasonable. Indeed, the reaching maneuver was only one piece of evidence that Davis relied on in making her findings. She also focused on inconsistencies in M.L.'s allegations, including the seat switching and the nature of her friendship with L.M. On these facts, M.L. has not created a triable case that Davis was deliberately indifferent in making her findings, let alone marshaled enough evidence to meet the higher standard that applies when school investigations are challenged under Title IX on erroneous outcome grounds. See Doe v. Trustees of Bos. Coll., 892 F.3d 67, 90 (1st Cir. 2018) (holding that Title IX claim challenging university disciplinary

proceedings on erroneous outcome grounds requires evidence that casts "some articulable doubt on the accuracy of the outcome" and indicates that "gender bias was a motivating factor") (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)).

Considering the whole record, the school's investigations, although imperfect, were not so lacking in either scope or execution to render them clearly unreasonable under the circumstances. Thus, defendants are entitled to summary judgment on this aspect of M.L.'s Title IX claim as well.

## IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. No. 37) is granted. The pending motions related to expert disclosures (Doc. Nos. 35 and 36) are denied as moot. The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

September 30, 2022

cc:    Counsel of record